# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **MONICA PERRY, o/b/o** | ) | |
| **J.P., as next friend,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv1654 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (the Commissioner), denying the application for supplemental security income benefits (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, filed on behalf of J.P. (Plaintiff) by her mother, Monica Perry, is before the undersigned for a final disposition pursuant to 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer; Plaintiff has also filed a reply brief.

## Procedural History

Ms. Perry applied for SSI on Plaintiff's behalf in July 2007, alleging her daughter was disabled as of June 20, 2007, due to attention deficit hyperactivity disorder (ADHD) and oppositional-defiant disorder. (R.[1] at 78-81.) This application was denied initially and

---

[1] References to "R." are to the administrative record electronically filed by the Commissioner with his answer.

following an administrative hearing in March 2009 before Administrative Law Judge (ALJ) Edward I. Pitts. (Id. at 6-20, 22-47.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Ms. Perry and Plaintiff, represented by counsel, testified at the administrative hearing.

Plaintiff testified that she was then in the ninth grade and was doing "okay" in school. (Id. at 26.) She was trying, but was not doing well in math. (Id. at 27.) She sees Dr. Portnoy every three weeks and takes the medication he prescribes every day at home. (Id. at 28.) The medication helps a little. (Id. at 29.) At the time of the hearing, she had been suspended for two weeks. (Id. at 29-30.) She had also been suspended in January for one week. (Id. at 30.) She does not get along with the other students, does not deal well with stress, and does not pay attention to safety rules. (Id. at 31.) She cries approximately every other week and feels sad sometimes. (Id.) Asked by her attorney if she thinks she is depressed, Plaintiff replied, "Yes." (Id.) She had received an award for improvement, but was no longer doing better and did not know why. (Id. at 32.)

Ms. Perry testified that Plaintiff lived with her and a nineteen-year old sister. (Id. at 32-33.) Plaintiff was not doing well in school. (Id. at 33.) Her problems started "[s]ome years" earlier. (Id.) She did not get along with the other children and did not follow rules and regulations. (Id. at 33-34.) She was suspended in January for cursing at the teacher. (Id. at 34.) The current suspension was for fighting with another girl. (Id.) Before that, she had not been in a fight for seven to eight months. (Id. at 35.) Her doctor was trying to find

the right medication for her. (Id. at 35-36.) Currently, she was taking Topomax; the dosage had doubled from 25 milligrams to 50. (Id. at 36.) A few weeks earlier, she was also started on Fluoxetine. (Id.)

Plaintiff was frequently absent in the eighth and ninth grades. (Id.) Plaintiff would oversleep and would not get up. (Id.) Ms. Perry was working at night and was not at home when school started. (Id.) A couple of times Ms. Perry was unable to refill Plaintiff's prescriptions because she worked at night. (Id. at 36-37.) It has been months since Plaintiff missed a refill of her medication. (Id. at 38.) Plaintiff had been doing better right before they moved. (Id.)

The ALJ asked Plaintiff if anything had changed when she moved to her new school, Roosevelt High School. (Id.) She replied that there was "activity" at the new school. (Id.) She does not go to school sometimes when her mother is working a night shift because she is tired. (Id. at 39.) She wakes up in the middle of the night and cannot go back to sleep. (Id.)

The ALJ then asked Ms. Perry if Plaintiff takes the medication on her own or needs to be reminded. (Id.) She replied that sometimes Plaintiff takes it without reminding. (Id.)

## Medical, School, and Other Records Before the ALJ

The records before the ALJ included reports Ms. Perry completed as part of the application process, school records, and medical records.

When applying for SSI for Plaintiff, Ms. Perry completed a Disability Report. (Id. at 106-12.) Plaintiff was 5 feet tall and weighed 115 pounds. (Id. at 106.) She was disabled

as of June 20, 2004.[2]  (Id. at 107.)  Ms. Perry was considering transferring Plaintiff to another school so her friends would not know she was in special education classes.  (Id. at 111.)

On a Function Report form for children ages twelve to eighteenth, Ms. Perry reported that Plaintiff did not have problems seeing, hearing, or talking.  (Id. at 94-96.)  Her daily activities and physical abilities were not limited.  (Id. at 97, 98.)  Plaintiff was limited in her ability communicate in that she did not tell jokes or riddles accurately and did not use sentences with "because," "what if," or "should have been."  (Id. at 97.)  She did, among other things, explain why she had done something (although she did not always tell the truth), ask for what she needed, and talked with family and friends.  (Id.)  Her progress in understanding and using what she has learned was limited in that she did not understand, carry out, and remember simple instructions.  (Id. at 98.)  Her impairments also affected her social activities and behavior with other people in that she did not generally get along with her sister or her school teachers.  (Id. at 99.)  She would often tell boys that she is older than she is.  (Id.)  Her ability to take care of her personal needs and safety was limited in that she did not (a) wash and put away her clothes, (b) help around the house, (c) get to school on time, (d) study and do her homework, (e) accept criticism or correction, (f) keep out of trouble, (g) obey rules, and (h) avoid accidents.  (Id. at 100.)  Ms. Perry sometimes has to tell her to take a bath, wash her hair, and brush her teeth.  (Id.)  Also, Plaintiff's ability to pay

_____

[2]The record does not include any explanation for the discrepancy between the year, 2004, for the alleged disability onset date listed in the disability report and the year, 2007, in the SSI application.

attention and stick with a task was limited in that she did not finish things she started or complete homework and chores. (Id. at 101.)

After the initial denial of Plaintiff's application, Ms. Perry completed a Disability Report – Appeal form. (Id. at 116-20.) There had been no changes in Plaintiff's impairments or limitations since she had completed the first report. (Id. at 116.) Plaintiff had not seen any health care provider since that time. (Id. at 117.)

The earliest medical record before the ALJ was a Healthy Children and Youth Screening Guide completed at Plaintiff's July 2006 visit to the health care providers at Grace Hill Neighborhood Health Centers (Grace Hill). (Id. at 156-60, 165-66.) The spaces for whether the child follows rules at school and at home were marked. (Id.) A vision and hearing test indicated no problems. (Id. at 167.)

It was noted on the screening guide completed when Plaintiff returned to Grace Hill in June 2007 that her mother was concerned that Plaintiff could not sit still and talked back to teachers. (Id. at 146-54, 161-63, 183-85.) Again, it was marked that Plaintiff followed rules at school and home. (Id. at 162, 184.) A notation indicates that there was a question whether Plaintiff had ADHD. (Id.)

Following a meeting with Brenda Conner, a licensed clinical social worker at Grace Hill, Plaintiff had a physical examination on August 23. (Id. at 178, 179, 181, 189, 190, 191.) The physician, Shulamit Portnoy, M.D., described Plaintiff as neatly dressed with an "[e]laborate hair do" and mismatched socks. (Id. at 179, 191.) She had a "[s]omewhat exaggerated happy affect" and was "[g]iggling, goofy, overall cooperative with exam, but

distractable." (Id.)  Instructions and questions had to be repeated or rephrased.  (Id.)  Her speech was intelligible; her insight and judgment were poor.  (Id.)  She read at a fourth grade level.  (Id.)  The diagnosis was ADHD, combined type; comorbid, or associated, oppositional-defiant disorder and conduct disorder; and learning difficulties.  (Id.)  She was started on a trial run of stimulant medications.  (Id.)  Her counseling appointment with Sharon West, Ph.D., had to be rescheduled because she had been late for the appointment.  (Id.)

Ms. Perry reported on September 9 that Plaintiff had not been started on Concerta because of insurance problems.  (Id. at 177, 193.)  She was offered a coupon to reduce the cost; however, the cost remained too expensive.  (Id.)  The insurance problem was to be resolved by the end of the month; Plaintiff would be started on the medication then.  (Id.)

Plaintiff met with Dr. West on October 2.  (Id. at 194.)  It was noted that Plaintiff had been transferred to a different school, Blow Middle, from Stevens Middle School after being placed in a special education class.  (Id.)  She was dressed appropriately and was described as being "very playful with her mother," requiring frequent redirection, and being "giddy to the point of being silly."  (Id.)  Her speech was normal in terms of pace, tone, and content; her thought processes were age appropriate.  (Id.)  Her judgment was poor.  (Id.)  Dr. West noted that Plaintiff had difficulty reading social cues and reacting appropriately to her peers.

(Id.)  She diagnosed her with ADHD and "[o]ther emotional disturbance."  (Id.)  She rated her Global Assessment of Functioning as 65.[3]  (Id.)

Dr. Portnoy saw Plaintiff again on October 25.  (Id. at 175-76, 195-96.)  No side effects from the Concerta were reported.  (Id. at 175, 196.)

Dr. West met with Plaintiff on November 30.  (Id. at 172.)  She noted that Plaintiff had "very prevalent" mood swings, ranging from being angry to tearful to giddy.  (Id.)  She was first "'babish [sic]'" and then became sullen and withdrawn.  (Id.)  Her mother reported that Plaintiff had "extreme difficulty in school with peers and teachers."  (Id.)  She had poor boundaries, could not regulate her behavior, and did not respond well to redirection.[4]  (Id.)

When Plaintiff next saw Dr. Portnoy, on January 28, 2008, she had not been taking Concerta since the end of December because her mother had not called in for a refill of the prescription.  (Id. at 215, 278.)  Plaintiff had not been suspended but had been in a fight with a girl.  (Id.)  Her dosage of Concerta was increased to 54 milligrams.  (Id.)

Plaintiff returned to Dr. Portnoy on April 10.  (Id. at 279.)  She had been "compliant" and had no outstanding concerns.  (Id.)  Her grades had improved.  (Id.)  Her prescription for

---

[3]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

[4]In her supporting brief, Plaintiff states that the notes of this visit indicated that her behavior issues would make interactions with others very difficult.  The Court found no such reference.

Concerta was renewed.  (Id.)  Her oppositional-defiant disorder and conduct disorder had improved.  (Id.)

Two weeks later, Plaintiff's eighth grade teacher, Mrs. Mayla Hayes, completed an ADHD diagnostic assessment questionnaire.  (Id. at 282.)  She responded positively to two of the nine symptoms of inattention, three of the nine symptoms of hyperactivity, five of the eighteen questions under the heading "combined," and two of the eight questions under the heading "performance."  (Id.)  She did not respond positively to any of the questions under the headings "oppositional-defiant/conduct disorder" and "anxiety/depression."  (Id.)

The next month, Plaintiff's math and social studies teacher for the seventh grade completed the same questionnaire.  (Id. at 281.)  She responded positively to five of the nine symptoms of inattention and of hyperactivity.  (Id.)  She also responded positively to ten of the eighteen "combined" questions and five of the eight "performance" questions.  (Id.)  She checked the box by "oppositional-defiant/conduct disorder."[5]  (Id.)

Ms. Perry informed Dr. Portnoy at Plaintiff's June 19 visit[6] that Plaintiff had received a "social promotion" to the ninth grade after completing the seventh grade.  (Id. at 284.)  Plaintiff was reportedly "doing much better" since her last visit.  (Id.)  She had remained calm and had had no outbursts.  (Id.)  She had no anxiety and no psychotic symptoms.  (Id.)

_____

[5]In her supporting brief, Plaintiff describes the teacher's responses on the assessment questionnaire as testing positive for oppositional-defiant disorder and anxiety/depression.  The teacher's responses did support a diagnosis of oppositional-defiant disorder; however, her responses are not a diagnosis and she did not mark the box labeled anxiety/depression.

[6]Plaintiff had been accompanied to the visit by her older sister.  Mrs. Perry had been contacted by telephone and was listed as the source of information.

Her associated oppositional–defiant and conduct disorders were described by Dr. Portnoy as "improved." (Id.) The Concerta prescription was renewed. (Id.)

Plaintiff again saw Dr. Portnoy on September 10. (Id. at 287.) Plaintiff was described as calm, cooperative, talkative, with a "mostly happy" affect and poor insight. (Id.) He decided to temporarily discontinue the Concerta and started Plaintiff on Topomax. (Id.) Her mother reported that she cried and appeared sad for no apparent reason. (Id.) Her answers of "yes" to all fourteen questions of a mood disorder questionnaire suggested there might be a bipolar disorder. (Id.) Dr. Portnoy noted that Plaintiff was sexually active and had finished a course of treatment for a sexually transmitted disease. (Id.)

Two weeks later, Plaintiff returned to Dr. Portnoy. (Id. at 289.) She and her mother were described as having "overall nonchalant dispositions." (Id.) She was giggling and laughing. (Id.) She had just returned to school after being suspended for two weeks. (Id.) When at home, she had not taken the Concerta. (Id.)

Dr. Portnoy continued Plaintiff on the Topomax and discontinued the Concerta. (Id.)

When Dr. Portnoy saw Plaintiff on December 11, she was described as being "[v]ery pleased with new school and own performance, proud about good grades." (Id. at 293.) Her mood disorder symptoms were described as being "[i]n remission." (Id.) There had been no incidents of disruptive behavior at school and she had received a certificate of recognition for academic achievement. (Id.) Dr. Portnoy continued Plaintiff on the Topomax. (Id.)

Plaintiff's school records before the ALJ begin with the sixth grade.

In Spring 2007, when Plaintiff was twelve years old and in the sixth grade, she had a psychological-education assessment due to concerns about her lack of academic progress and her behavior. (Id. at 126-41.) Since entering kindergarten, Plaintiff had attended six schools. (Id. at 127.) She had attended one school for kindergarten, another school for first through third grades, two schools in the fourth grade, a different school for fifth grade, and yet another school, her then-current school, for the sixth grade. (Id.) She had not repeated any grades. (Id.) Her sixth grade teacher placed her at a second grade level in the areas of reading, written expression, spelling, and mathematics. (Id.) She was receiving Ds and Fs in the core subjects. (Id.) Several classroom modifications had been made to assist her, i.e., preferential seating, extra time to complete assignments, reduced length of assignments, and individual and small group instruction and counseling. (Id.) She had received "numerous" in-school and out-of-school suspensions. (Id.) Her teacher estimated her current cognitive functioning to be below average. (Id.) Plaintiff placed in the average range of intellectual functioning on the Stanford-Binet Intelligence Scales – Fifth Edition. (Id. at 128, 138.) Her scores on the Wechsler Individual Achievement Test (WAIT) placed her in the third grade equivalent range for the areas of basic reading, math reasoning, and reading comprehension, in the second grade range for numerical operations, and in the kindergarten range for written expression. (Id.) In the current school year, she had had nine out-of-school suspensions and two in-school suspensions. (Id. at 129-30.) Four suspensions were for physical altercations; seven were for not following the rules, including running from the school and swearing at school officials. (Id.) The day before the assessment she had stomped on a classroom table

and broken one of its legs. (Id. at 130.) A consequence for this behavior was not yet imposed. (Id.) One of her classroom teachers described her behavior as out of control and opined that she did not belong in a regular classroom. (Id.) Her quotient on the Behavior Education Scale placed her behavior as "very poor." (Id. at 130, 138.) Her adaptive behavior as described by her mother placed her functioning at a moderately low deficit adaptive level on the Vineland Adaptive Behavior Scale – Interview Edition. (Id. at 130, 139.)

　　　As part of the assessment, Plaintiff's teacher had assessed the severity of her problems in the categories of basic reading skills, reading comprehension, written expression, mathematics calculation, mathematics reasoning, work habits, classroom behaviors, interpersonal behaviors, intrapersonal behaviors, listening comprehension, and oral expression. (Id. at 132-37.) Her school counselor had assessed the severity of her problems in the areas of work habits and classroom behaviors. (Id. at 135.) In the academic categories of basic reading skills, reading comprehension, and written expression, the teacher rated the severity of Plaintiff's problem from nonexistent to moderate and the frequency as weekly. (Id. at 132-33.) She had no problem in any of the eighteen areas of mathematics calculation and mathematics reasoning with two exceptions; she had a mild, daily problem with (i) fractions/decimals and geometry, and (ii) solving word problems. (Id. at 134.) In the categories of work habits, classroom behaviors, interpersonal behaviors, and intrapersonal behaviors, the teacher rated her primarily as having a severe, daily problem in the specific areas within each category. (Id. at 135-36.) Her counselor gave her the same rating in the

two categories she assessed. (Id. at 135.) In the twenty-two areas for the categories of listening comprehension and oral expression, Plaintiff's teacher rated her as having a severe daily problem in demonstrating disruptive/off-task behaviors during activities requiring listening skills and in demonstrating inappropriate voice quality, rate, pitch or volume. (Id. at 137.) She had either a mild problem or no problem in the remaining twenty areas. (Id.)

The conclusion of the assessment team was that Plaintiff met the criteria of the Missouri State Plan for Special Education for a diagnosis of emotional disturbance. (Id. at 140-41.)

A report for Plaintiff for the sixth grade at Stevens Middle School listed Ds and Fs in all subjects. (Id. at 169.) The teachers commented that she talked instead of working, displayed poor classroom behavior, did not obey established rules, and did not complete assignments. (Id.) She had to improve her attendance. (Id.) The first semester she was absent 24.5 days and was tardy 22. (Id.) The second semester she was absent 34.5 days and tardy 51. (Id.) She was going to have to pass summer school. (Id.)

As noted above, Plaintiff attended Blow Middle School in the 2007/2008 academic year. (Id. at 224-51.) She was then in the eighth grade. She was in a regular classroom at least 80% of the time. (Id. at 228, 239.) During that time, she received 800 minutes each week of special education services, including 125 minutes of instruction in social skills and anger management. (Id. at 237.) She was described as being able to diligently work when she was not upset. (Id. at 230, 261.) She had a temper and pouted when she did not get her way. (Id.) She read at the seventh grade level and had "very good decoding skills." (Id.)

Her oral reading and comprehension skills were also good.  (Id.)  Her written language skills were impressive.  (Id.)  She could do "basic addition, subtraction, multiplication and some division."  (Id.)  She was "very articulate" and had "some strong leadership qualities."  (Id.)  One of her IEP goals was to increase her social interaction by working cooperatively and interacting appropriately with peers and teachers 90% of the time.  (Id. at 236, 267.)  She was also to learn how to control her "[l]oud outbursts in the classroom" when she did not get her way.  (Id. at 245, 275.)

Notations in her records for that year include one for getting into a physical confrontation with another student in the cafeteria in October, getting in a physical confrontation in line in November, leaving the building without permission in January, promoting a fight in March, and using profanity when speaking to her teacher, the counselor, and a security guard, also in March, and fighting on the bus in April.  (Id. at 247.)  During the school year, she was absent 32 full days and 6 half-days, she was present 77% of the time.  (Id. at 250.)

When first in the ninth grade, Plaintiff attended Sumner High School.  (Id. at 253-75.)  She enrolled in August 2008 and withdrew in November after the family moved.  (Id. at 253, 258, 292.)  In the interim, she was absent for 37 days, tardy for 45 days, and suspended for 10 days after being caught cutting classes, directing threatening profanity at an administrator, and using her cell phone.  (Id. at 253, 255.)

Plaintiff next attended Roosevelt Ninth Grade Center.  (Id. at 296-99.)  She was present 62% of the time and had grades that were predominantly Ds and Fs.  (Id. at 296.)

In the four months covered by the report, she had had two conferences for disrupting the class, one conference for walking out of class, an in-school suspension for being in an unauthorized area, and two out-of-school suspensions.  (Id. at 299.)  The first, five-day suspension was for cursing the teacher; the second, ten-day suspension was for fighting. (Id.)

The ALJ also had before him a Teacher Questionnaire completed by the guidance counselor when Plaintiff was at Stevens Middle School.  (Id. at 198-205.)  She reported that Plaintiff did not have any problems in the domain of acquiring and using information and was an independent learner.  (Id. at 199.)  Plaintiff had a problem in two of the eleven activities listed for the domain of attending and completing tasks, i.e., she had an hourly, slight problem in changing from one activity to another without being disruptive and a hourly, very serious problem in completing her classroom and homework assignments.  (Id. at 200.)  She could, but chose not to, complete her assignments.  (Id.)  In the domain of interacting and relating with others, Plaintiff had an hourly, serious problem in the activities of asking permission appropriately and respecting/obeying adults in authority.  (Id. at 201.) She had no problem in the remaining eleven activities listed.  (Id.)  The counselor noted that Plaintiff had no problem with her peers but viewed herself as an adult and wanted adults to also.  (Id.)  Plaintiff had no problem in the domains of moving about and manipulating objects and of health and physical well being.  (Id. at 202, 204.)  In the domain of caring for herself, she had a slight problem in handling frustration appropriately, being patient when

necessary, responding appropriately to changes in her mood, and using appropriate coping skills to meet daily demands of the school environment.  (Id. at 203.)

A Childhood Disability Evaluation Form (CDEF) was completed for Plaintiff in September 2007 by a non-examining consultant.  (Id. at 206-12.)  Her only medically-determined impairments were ADHD "vs." behavior disorder.  (Id. at 206.)  This impairment was severe but did not meet or equal an impairment of listing-level severity.  (Id.)  It did cause less than marked limitations in the domain of acquiring and using information and marked limitations in the domain of interacting and relating with others.  (Id. at 208.)  Explaining the latter assessment, the consultant noted that Plaintiff had multiple discipline problems in the last academic year and had recently had a educational diagnosis of emotional disturbance.  (Id.)  Plaintiff did not have any limitations in the remaining four domains.  (Id.)

In September 2008, Dr. Portnoy completed a Childhood Functional Assessment Form on behalf of Plaintiff.  (Id. at 219-22.)  Dr. Portnoy assessed Plaintiff as having moderate limitations in all eight activities listed for the domain of acquiring and using information and in seven of the eight activities for the domain of attending and completing tasks (she had no limitation in the activity of remaining alert).  (Id. at 220.)  In the domain of interacting and relating with others, Plaintiff was assessed as having marked limitations in three of the ten activities, moderate limitations in five, and no or slight limitations[7] in two.  (Id. at 221.)  She had no or slight limitations in the five activities for the domain of moving about and manipulating objects.  (Id.)  Plaintiff had marked limitations in three of the seven activities

---

[7]The form does not distinguish between none and slight.

in the domain of caring for self, including avoiding harmful behavior toward herself, following safety rules, and coping with stress; moderate limitations in two activities; and no or slight limitations in the remaining two activities. (Id. at 222.) Dr. Portnoy rated Plaintiff's GAF as 65.[8] (Id.)

## The ALJ's Decision

After noting that Plaintiff, a school-age child, was not, and had not been at any relevant time, engaged in substantial gainful activity, the ALJ concluded that she had severe impairments of ADHD and oppositional-defiant disorder. (Id. at 12.) These conditions did not, singly or in combination, meet or medically or functionally equal an impairment of listing-level severity. (Id.)

Addressing Plaintiff's ability to function in the six relevant domains, the ALJ first found that Ms. Perry's opinions were "only partly credible" in that "she did not have much detailed information about [Plaintiff's] limits and caused [sic] of her behavior." (Id. at 13.) "[Plaintiff's] mother seemed especially unconcerned about [Plaintiff's] recent school suspension." (Id.) The ALJ found that Dr. Portnoy's assessment was credible except for the marked limitation in the domain of caring for oneself. (Id.) This assessment lacked any support in the medical notes. (Id.)

---

[8]See note 2, supra. This is the same GAF assessment given by Dr. West one year earlier when Plaintiff had not yet begun to take medication for her ADHD.

The ALJ next found that Plaintiff's limitation in the domain of acquiring and using information was less than marked.[9]  (Id. at 14.)  He noted that although Ms. Perry had indicated that Plaintiff was limited in her progress in understanding and using what she had learned, Plaintiff had testified that she was doing okay in school with the exception of mathematics, her teachers had indicated that she had mild to moderate problems in reading and writing and no problems in mathematics, she was described as being very articulate, and she had been described in August 2007 as having no problems in that domain and as being an independent learner.  (Id.)  Moreover, although she had scored below the 10th percentile in the WIAT, she had scored in the average range of the Stanford-Binet.  (Id.)

Plaintiff also had a less than marked limitation in the domain of attending and completing tasks.  (Id. at 15.)  Contrary to Ms. Perry's assessment that Plaintiff was limited in her ability to pay attention and stick with a task, Plaintiff's school records showed she always completed her class assignments and her class work was neat.  (Id.)  School records also showed she talked too much in class and a teacher had reported that Plaintiff "had severe problems being easily distracted, making transitions, and socializing at inappropriate times." (Id.)  This teacher also reported that Plaintiff had mild problems giving up too easily and needing directions repeated.  (Id.)  A counselor reported that Plaintiff "had a very serious problem completing assignments and a slight problem changing from one activity to another without being disruptive, but otherwise had no problem attending and completing tasks." (Id.

_____

[9]A child has a "marked" limitation in a domain when her impairment seriously interferes with her ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  A marked limitation is "a limitation that is 'more than moderate' but 'less than extreme.'"  Id.

at 15-16.)  Dr. Portnoy had sometimes observed Plaintiff to be fidgety and distracted and in September 2008 to be calm.  (Id. at 16.)  The ALJ had observed her to have "some mild difficulty paying attention."  (Id.)

In the domain of interacting and relating with others, Plaintiff had a marked limitation based on her testimony, school records, and the reports of Ms. Perry, a school counselor, and Dr. Portnoy.  (Id. at 17.)

Plaintiff had no limitation in the domains of moving about and manipulating objects, caring for herself, and health and physical well-being based on the medical records and the reports of Ms. Perry, Dr. Portnoy, and a school counselor.  (Id. at 18-19.)

Because Plaintiff did not have an impairment or combination of impairments that resulted in marked limitations in at least two domains or an extreme domain in at least one, she was not disabled within the meaning of the Act.  (Id. at 20.)

### Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**

**v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995). "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'" **England v. Astrue**, 490 F.3d 1017, 1019 (8th Cir. 2007) (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Id.**; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child is currently engaged in substantial gainful activity; (2) whether the child suffers severe impairments or a combination of severe impairments; and (3) whether the child's impairments meet or equal any listed impairments. **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998). If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments (a) cause "marked" limitations in two of six domains and or an "extreme" limitation in one and (b) meet the duration

requirement of at least one year. 20 C.F.R. § 416.926a(d); accord **England**, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)). The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## Discussion

Plaintiff argues that the ALJ erred by (1) not giving proper weight to the assessment of Dr. Portnoy that she has marked limitations in the domain of caring for oneself and (2) not specifically discussing the reasons for discrediting the credibility of Ms. Perry.

The ALJ accepted Dr. Portnoy's September 2008 assessment of Plaintiff's abilities to function in the six relevant domains with the exception of the domain of caring for herself, finding that this assessment lacked support in the medical notes. Dr. Portnoy concluded that Plaintiff had marked limitations in three of the seven activities in this domain, including avoiding harmful behavior toward herself, following safety rules, and coping with stress; moderate limitations in two activities, including using language sufficiently to express her basic wants and needs and coping with change; and no or slight limitations in the remaining two activities, including bathing and personal hygiene and sleeping. Plaintiff argues that the ALJ's decision discounting Dr. Portnoy's conclusions is not supported by substantial evidence on the record as a whole.

In assessing a child's alleged disability, this domain of "caring for onself" requires consideration of how well that child can maintain her emotional and physical health,

including an ability to fulfill wants and needs, as well as cope with stress and change. <u>See</u> 20 C.F.R. § 416.926a(k). "Caring for [one]self means recognizing when [one is] ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to [one's] circumstances in safe and appropriate ways, making decisions that do not endanger [one], and knowing when to ask for help from others." 20 C.F.R. § 916.926a(k)(1)(iv). A child of Plaintiff's age "should feel more independent from others and should be increasingly independent in all of [her] day-to-day activities. . . . [She] should begin to appropriate ways to express [her] feelings, both good and bad . . . ." 20 C.F.R. § 416.926a(k)(2)(v). Examples of limited functioning in this domain include not dressing or bathing appropriately for one's age, engaging in self-injurious behavior, or ignoring safety rules. 20 C.F.R. § 416.926a(k)(3)(iii), (iv); <u>Title XVI: Determining Childhood Disability – The Functional Equivalence of "Caring for Yourself."</u>, Social Security Ruling 09-7p, 2009 WL 396029, *5 (S.S.A. Feb. 17, 2009).

As noted above, the ALJ discounted Dr. Portnoy's assessment of Plaintiff's ability to function in this area on the grounds it was not supported by the medical records. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); <u>accord</u> **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). Title 20 C.F.R. § 416.927(d) delineates six factors to be evaluated when

weighing opinions of treating physicians: (1) the examining relationship; (2) treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "any factors [the claimant] bring[s] to [the ALJ's] attention," and "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

Dr. Portnoy began seeing Plaintiff in August 2007 and saw her seven times before completing the assessment form. Thus, consideration of the first two relevant factors, the examining and treatment relationship, favors giving that assessment controlling weight. Cf. **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (affirming ALJ's decision discounting opinion of treating specialist "based on the infrequent nature of the treatment visits").

Consideration of the third and fourth factors, supportability and consistency, do not favor giving her assessment such weight. Dr. Portnoy's medical records do not reflect the limited functioning she describes in her assessment. Indeed, three months earlier she had been informed by Ms. Perry that Plaintiff was doing better, was calm, and had had no outbursts, anxiety, or psychotic symptoms. She was calm and "mostly happy" when she saw Dr. Portnoy the same month as the assessment. It was Ms. Perry, not Dr. Portnoy, that reported that Plaintiff appeared sad and cried for no reason. Plaintiff had not been taking her ADHD medication for a few weeks prior to this visit and had recently started at a new high

school[10] and was frequently absent or tardy (Ms. Perry worked at night and was not at home when school started). Although Plaintiff had contracted a sexually transmitted disease and was sexually active, she had been compliant with her medication for such. Moreover, as noted by the Commissioner, that same month she was described as having the same nonchalant disposition as her mother and was giggling and laughing. At the visit after the assessment, Plaintiff was pleased with her new school and there had been no incidents of disruptive behavior.[11]   Cf. **Garrett ex rel. Moore**, 366 F.3d at 652 (remanding for reconsideration of domain of caring for oneself application of adolescent who had been hospitalized after attempting suicide on three separate occasions during nine-month period). And, the checklist format of Dr. Portnoy's assessment limits its evidentiary value. See **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010) (citing Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).

Consideration of the fifth factor, specialization, neither increases nor lessens the weight to be given Dr. Portnoy's assessment. Plaintiff cites no additional factor not considered by the ALJ that would fall within the ambit of the sixth factor or that would

---

[10]The Court notes that Plaintiff was at this high school for only four months before having to change schools for the ninth time when her family moved.

[11]In her supporting brief, Plaintiff notes that she had been in trouble at school twelve times between October 2006 and April 2007. Her alleged disability onset date, however, is two months after this period ended. Moreover, the period cited by Plaintiff is before she was prescribed medication for her ADHD. An impairment that is controllable by medication is not disabling. See **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007). See also **Briggs v. Callahan**, 139 F.3d 606, 609 (8th Cir. 1998) (affirming ALJ's decision that child was not disabled when her hyperactivity was controlled by medication).

counteract the negative conclusions reached after consideration of the third and fourth factors.

In short, Dr. Portnoy's assessment is based on conclusory opinions that are unsupported by the record or her own evaluation notes and was properly discounted. See **Clevenger v. SSA**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes).

Plaintiff next argues that the ALJ erred by not properly evaluating the credibility of her mother, Ms. Perry. The ALJ found Ms. Perry to be only partly credible on the grounds that Ms. Perry did not appear to have much detailed information about Plaintiff and her behavior. Thus, the basis for discounting Ms. Perry's opinions was the lack of foundation, not the factors outlined in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Nor does Plaintiff explain how the lack of a discussion of such factors prejudiced her. See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) (holding that "an arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome") (interim quotations omitted).

## Conclusion

For the reasons set forth above, the ALJ's decision that Plaintiff did not have an impairment that met or functionally or medically equaled an impairment of listing-level severity is supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is AFFIRMED and

the case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of  February, 2011.